# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARAGON TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-1013-LWW |
| | ) | |
| TERENCE J. CRYAN, PHILIPP | ) | |
| STRATMANN, PETER E. SLAIBY, | ) | |
| CLYDE W. HEWLETT, NATALIE | ) | |
| LORENZ-ANDERSON, DIANA G. | ) | |
| PURCEL, and OCEAN POWER | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 28, 2023
Date Decided: November 30, 2023

Stephen E. Jenkins, Richard D. Heins, ASHBY & GEDDES, P.A., Wilmington, Delaware; Renee M. Zaytsev, Constance M. Boland, Ned Babbitt, THOMPSON HINE LLP, New York, New York; Thomas Palmer, THOMPSON HINE LLP, Columbus, Ohio; Ryan Blackney, THOMPSON HINE LLP, Chicago, Illinois; *Counsel for Plaintiff Paragon Technologies, Inc.*

Michael A. Pittenger, Christopher N. Kelly, Tyler J. Leavengood, David A. Seal, Callan R. Jackson, Christopher D. Renaud, Ryan M. Ellingson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendants Terence J. Cryan, Philipp Stratmann, Peter E. Slaiby, Clyde W. Hewlett, Natalie Lorenz-Anderson, Diana G. Purcel, and Ocean Power Technologies, Inc.*

**WILL, Vice Chancellor**

This action is brought by Paragon Technologies, Inc.—a stockholder of Ocean Powers Technology, Inc. Paragon wishes to nominate candidates to OPT's board of directors. In August, it sent a notice of its intention to OPT. Five weeks later, the board rejected Paragon's notice as noncompliant with OPT's advance notice bylaws.

Paragon also sought to purchase additional shares of OPT stock in furtherance of its proxy contest. But OPT has a rights plan for the stated purpose of protecting its net operating losses. Paragon's request for an exemption from the rights plan was denied.

Paragon moved for a preliminary injunction requiring the board to let Paragon's candidates stand for election and grant Paragon's exemption request. Since this is mandatory relief, Paragon took on a significant burden—one it did not carry.

I reach that conclusion with some trepidation. The board amended its bylaws and adopted the rights plan after Paragon emerged on the scene. The board spent weeks reviewing Paragon's nomination notice for deficiencies, raised numerous issues of varying degrees of importance, rejected the notice at the end of the nomination window, and then raised more deficiencies in this litigation. Some of the bylaws Paragon purportedly violated are ambiguous or seem untethered from a legitimate corporate end.

1

Still, there are countervailing facts. One of OPT's bylaws requires a nominating stockholder to disclose its plans or proposals for the company. Contemporaneous communications suggest that Paragon may have had such plans if its proxy contest succeeded and it gained control of the board, including a stock for stock reverse merger. Absent credibility determinations (and given that Paragon's principal deleted his text messages), I cannot say whether such undisclosed plans exist. More generally, there is evidence that the board enforced certain bylaws to uphold important corporate interests and rejected the exemption request to protect OPT's valuable NOLs. Whether this is pretextual is another matter I am unable to resolve at this stage.

It remains to be seen whether Paragon will ultimately prevail on its breach of fiduciary duty claims. For now, it chose to seek a preliminary mandatory injunction on fact-intensive matters and a limited record. To grant Paragon what amounts to final relief would be inequitable.

## I. FACTUAL BACKGROUND

The following background is drawn from the undisputed facts in the plaintiff's Verified Amended and Supplemental Complaint for Injunctive and Declaratory Relief and the record developed during discovery.[1] This record, which was presented in connection with the plaintiff's motion for a preliminary injunction, includes 127 exhibits and the deposition testimony of 13 witnesses.[2] The facts summarized below are those likely to be found after trial.

### A. OPT and Its Board

Ocean Power Technologies, Inc. ("OPT") is a Delaware corporation providing maritime intelligence solutions based on renewable energy platforms and autonomous vehicles.[3] Its current market capitalization is approximately $15 million.[4] OPT's common stock is publicly traded and registered on the NYSE American exchange as "OPTT."

---

[1] Verified Am. and Suppl. Compl. for Injunctive and Declaratory Relief (Dkt. 78) ("Am. Compl.").

[2] Citations in the form "PX__" refer to exhibits to the Transmittal Affidavit of Richard Heins in Support of Plaintiff Paragon Technologies, Inc.'s Opening Brief in Support of Its Motion for a Preliminary Injunction. Dkt. 112. Citations in the form "DX__" refer to exhibits to the Transmittal Affidavit of Ryan M. Ellingson in Support of Defendants' Answering Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction. Dkt. 125. Where documents lack internal pagination, they are cited by the last four digits of their Bates stamps. Deposition transcripts are cited as "[Name] Dep."

[3] DX 1 at 2; *see* Am. Compl. ¶ 17.

[4] PX 60 ("Weiser Dep.") 167.

OPT has long faced financial struggles. OPT has never turned a profit since it began operations in 1994.[5] In the last five years, OPT's fiscal health has further deteriorated with its revenues unable to keep pace with increasing expenses.[6] For instance, OPT's cumulative net losses for the last three years have totaled approximately $60 million, compared to $5.7 million in cumulative revenues.[7] OPT's net operating losses (NOLs) are its most valuable asset.[8] Its stock price is currently under $0.30 per share.[9]

In recent years, OPT has shifted its business strategy to focus on optimizing data and sales from certain services and products, including autonomous surface vehicles.[10] OPT has also expanded its market reach to include the defense, security, and surveillance industries.[11] Despite its relationships with government agencies, OPT presently has no contracts with the United States Department of Defense or the Department of Homeland Security.[12]

---

[5] Am. Compl. ¶ 19.

[6] *Id.* ¶ 24.

[7] *Id.*

[8] *See* PX 52 ("Slaiby Dep.") 164, 176; PX 56 ("Cryan Dep.") 13, 44, 29-30.

[9] Am. Compl. ¶ 12.

[10] DX 1 at 2-6.

[11] *Id.* at 11-13.

[12] *See id.* at 8, 14-15, 26. There is nothing in the present record to indicate otherwise.

As part of its revisioning, OPT refreshed its board of directors (the "Board") and senior management. Between 2020 and 2021, OPT added five new directors to its six-member Board.[13] The Board is currently composed of defendants Terence J. Cryan (Chairman), Philipp Stratmann, Clyde Hewlett, Natalie Lorenz-Anderson, Diana Purcel, and Peter Slaiby.[14] Stratmann has served as OPT's President and Chief Executive Officer since June 2021.[15]

## B. Paragon's Investment and Outreach

Plaintiff Paragon Technologies, Inc. is a publicly traded Delaware corporation "that makes value-based investments in misunderstood businesses."[16] Paragon operates through various subsidiaries focused on sectors including automation solutions, technology hardware, and real estate.[17] It owns approximately 3.9% of OPT's outstanding stock, which Paragon believes makes it OPT's single largest stockholder.[18]

---

[13] DX 2 at 1-3.

[14] *Id.*; Am. Compl. ¶¶ 18, 22. Only Cryan (who has been a director since 2012) was on the Board before December 2020. *Id.* ¶¶ 18, 22.

[15] Am. Compl. ¶ 18.

[16] *Id.* ¶ 16.

[17] *Id.*

[18] *Id.*

5

Paragon is led by Hesham Gad, who has served as Paragon's Chairman since 2012 and as its Chief Executive Officer since 2014.[19]  He serves alongside two other members of Paragon's board of directors: Samuel Weiser and Col. Jack Jacobs.[20]

Paragon began acquiring OPT stock in July 2022.[21]  On December 15, 2022, Gad contacted OPT to express that Paragon—as a purported 2% owner of OTP's stock—was interested in "providing additional capital to OPT."[22]

Gad and Stratmann eventually held a call on April 14, 2023.[23]  Gad suggested he might write to the Board about potential cost-cutting measures since he was concerned about OPT's cash depletion.[24]  After the call, Stratmann told Cryan that Gad "thinks there is insufficient oversight" at OPT and "posted a letter demanding a board seat and outlining his concerns."[25]  Stratmann noted that Gad "appears to like proxy fights" and had "used the same playbook back in 2010 . . . to take over Paragon."[26]

---

[19] *Id.* ¶ 64; DX 4; DX 6; PX 33 at '3254.

[20] DXs 5-6; *see* Am. Compl. ¶ 64.

[21] PX 33 at '4256-72.

[22] DX 7.

[23] *See* DX 8 at '2278.

[24] *Id.*; *see also* PX 57 ("Gad Dep.") 66; PX 51 ("Stratmann Dep.") 58.

[25] PX 71 at '0193.

[26] *Id.* at '0192 (expressing that Gad "isn't shy about publicly denouncing CEOs, chairmen, and anyone else he sees as not fit to his ideas").

## C. Gottfried's Retention and Paragon's May 19 Letter

Meanwhile, the Board began to consider updating Paragon's bylaws, which had last been amended in June 2016.[27] On May 17, the Board retained attorney Keith Gottfried to review OPT's "preparedness for a possible activist investor campaign and/or an unsolicited takeover offer."[28] Gottfried specializes in "shareholder activism defense."[29]

On May 19, Gad sent a letter to Stratmann and Cryan, representing that Paragon owned 3.3% of OPT's stock.[30] Gad expressed concern with OPT's cash depletion and lack of a viable business plan.[31] He also "formally request[ed]" the "timely appointment of Paragon's three directors [i.e., Gad, Weiser, and Jacobs] to the Board of OPT."[32]

On May 22, Cryan circulated Paragon's May 19 letter to the Board, announced the retention of Gottfried, and called a "non-minuted board call" the next day to discuss these developments.[33] On May 25, Stratmann requested that OPT's current

---

[27] DX 18 at 1; Cryan Dep. 22-23, 29-30 (testifying that he considered whether OPT's bylaws should be updated to reflect the new universal proxy rules).

[28] PX 69 at '5223.

[29] PX 72.

[30] PX 3 at '2245.

[31] *Id.*

[32] *Id.* at '2247.

[33] PX 4 at '0285.

7

bylaws be sent to Gottfried and used the subject line "Project Echo"—OPT's code name for its response to Paragon.[34]  Gottfried also began work on an "NOL Rights Plan."[35]

### D.    The Amended Bylaws

On June 5, the Board met "to discuss the [May 19] letter received from Paragon."[36]  Gottfried presented a "proposed amendment to [OPT's] bylaws related to its advanced notice provisions" and discussed potential activist defense strategies.[37]  He also provided an overview of Paragon, its corporate structure, and its history as an activist stockholder.[38]  The Board "discussed the amendments" to the bylaws Gottfried proposed and "decided to postpone final approval" to allow time for further review.[39]

After the meeting, Stratmann sent Gad a letter offering to have the Board's Nominating and Corporate Governance Committee consider Paragon's candidates.[40]

---

[34] PX 5 at '0346; *see* PX 50 ("Hewlett Dep.") 159-60.

[35] PX 12; PX 6.

[36] PX 9 at 1; *see also* PX 8.

[37] PX 9 at 2.

[38] *Id.*

[39] *Id.* at 4.

[40] DX 15.

Stratmann's letter enclosed a copy of a directors' questionnaire for Paragon's proposed candidates to complete.[41] Paragon declined this offer.[42]

On June 8, the Board unanimously approved the proposed bylaw amendments (the "Amended Bylaws").[43] The changes were primarily to Section 1.10, which addresses "Advanced Notice of Stockholder Nominations for Directors and Other Stockholder Proposals."[44] The Amended Bylaws require a stockholder seeking to nominate a director candidate to disclose, among other things, a description of:

- any "plans or proposals" of the nominating stockholder relating to OPT "that would be required to be disclosed" under Item 4 of Schedule 13D;[45]

- "events, occurrences, and/or circumstances . . . that could impact, impede, and/or delay" the proposed nominees' "ability to receive a security clearance";[46]

- "any business or personal interests" that could create "a potential conflict of interest" between OPT and the proposed nominee;[47]

---

[41] *See id.* at '0659.

[42] DX 17 (Gad expressing disappointment with Stratmann's June 6 letter and rejecting the "song and dance interview process" involving the Nomination and Governance Committee); *see also* DX 16 at '1464 (Jacobs describing the Board's "insistence on a bureaucratic process as a means to avoid talks").

[43] DX 18 at 1.

[44] *Id*. Ex. A ("Bylaws") § 1.10.

[45] *Id.* § 1.10(a)(3)(iv)(B).

[46] *Id.* § 1.10(a)(3)(i)(K).

[47] *Id.* § 1.10(a)(3)(i)(I).

9

- information about the proposed nominees (and, as amended, the noticing stockholder) required to be included in a proxy statement under Regulation 14A;[48] and

- a completed questionnaire with a written representation and agreement in the form provided by OPT.[49]

The Amended Bylaws also provide that "[i]f any information in a Stockholder Notice submitted pursuant to [] Section 1.10 is determined to be inaccurate in any respect," the notice "may be deemed not to have been provided in accordance with [] Section 1.10."[50]

### E.     The Section 382 Plan

On June 29, the Board adopted a Section 382 Tax Benefits Preservation Plan ("Section 382 Plan").[51] OPT's announcement of the Section 382 Plan said that the Board was attempting to "diminish the risk that [OPT's] ability to utilize its [NOL] carryovers . . . to reduce potential future federal income tax obligation may become substantially limited."[52] The Section 382 Plan "is intended to act as a deterrent to any person or group acquiring beneficial ownership of 4.99% or more"

---

[48] *Id.* §§ 1.10(a)(3)(i)(M), (iv)(E).  According to the Board, this requirement was included in the 2016 bylaws.  *See* Defs.' Answering Br. in Opp'n to Pl.'s Mot. for a Preliminary Injunction (Dkt. 125) ("Defs.' Answering Br.") 33.

[49] Bylaws § 1.10(a)(4)(A).

[50] *Id.* § 1.10(c)(1).

[51] PX 16.

[52] *Id.* at 2.

of OPT's outstanding common stock "without the approval of the Board."[53] Purchasing more than 4.99% of OPT's common stock would trigger significant dilution.[54]

Section 382 of the Internal Revenue Code restricts a company's use of NOLs if it has undergone an "ownership change," which occurs when over 50% of a company's ownership changes over a rolling three-year period (counting stockholders who hold or obtain a 5% or greater block).[55] OPT has approximately $220 million in NOLs available for carryover.[56] Due to "ownership changes" in October 2016, April 2019, and January 2021, only $94 million is currently available for preservation and free from limitation.[57]

### F.    Paragon's Proxy Contest

On July 7, Paragon filed a Schedule 13D with the Securities and Exchange Commission (SEC).[58] Paragon disclosed its 3.9% ownership of OPT's outstanding shares and stated that "intend[ed] to provide a slate of director nominees" for the

---

[53] *Id.* at 3.

[54] *Id.* at 2-3.

[55] 28 U.S.C. § 382; *see* PX 16 at 2.

[56] DX 10.

[57] *Id.*

[58] PX 18 at '2588, '2590.

OPT Board.[59] The Schedule 13D attached a letter to OPT stockholders criticizing OPT's management and financial performance and stating that Paragon had "a plan to fix OPT."[60] On July 11, Paragon re-issued the letter as a press release.[61] In a July 26 text message, Weiser informed Jacobs that Paragon had "agreed to move forward with a slate of directors" for OPT.[62]

### G. Paragon's Exemption Request

Amid its preparations for a proxy contest, Paragon sought an exemption from the Section 382 Plan so that it could buy up to 19.9% of OPT's outstanding shares (the "Exemption Request").[63] The Board discussed the Exemption Request with counsel and OPT's tax advisor, EisnerAmper LLP, which had been retained in 2021 to assess the application of Section 382 to OPT.[64] After a regularly scheduled Board meeting on October 11, the Board denied Paragon's Exemption Request on October 12.[65]

---

[59] *Id.* at '2590; *see* Am. Compl. ¶ 62.

[60] PX 18 at '2588-91.

[61] PX 19.

[62] DX 23 at '2491.

[63] PX 25.

[64] PX 42; PX 1 (retaining EisnerAmper "to analyze changes in the ownership of the stock of [OPT] for purposes of determining the application of [IRC] Section 382 to OPT"); *see also* PX 13; DX 3.

[65] PX 42.

## H. Paragon's Nomination Notice

On August 25, Paragon submitted a notice of its intent to nominate director candidates for election to the Board at OPT's next annual meeting (the "Notice").[66] Paragon sought to nominate five individuals: Gad, Jacobs, Weiser, Shawn M. Harpen, and Robert J. Tannor.[67] The Notice itself is nine pages long, but spans over 1,000 pages with attachments—including various SEC filings and completed director questionnaires from the proposed candidates.[68]

OPT acknowledged receipt of the Notice on August 28 and began reviewing it for completeness.[69] Approximately three weeks remained in the nomination window, which was set to close on September 15.[70]

## I. The Board's Response

In a September 6 letter to Paragon, OPT complained that the Notice had "relatively few cross-references to any of the advance notice requirements in the [Amended] Bylaws."[71] OPT explained that the Board's "review of the Purported Nominating Notice [wa]s continuing and no decision ha[d] been made by OPT, the

---

[66] PX 33.

[67] *Id.* at '3254-59. Tannor withdrew as a nominee on November 12. PX 54.

[68] PX 54; *see also* Am. Compl. ¶ 65.

[69] *See* PX 34 at 1.

[70] *See* Am. Compl. ¶ 3.

[71] PX 34 at 1-2.

OPT Board, or any committee thereof with respect to the Purported Nominating Notice."[72]

OPT subsequently issued two deficiency letters. In a September 8 letter (the "First Deficiency Letter"), OPT raised multiple purported faults in the Notice under eight sections of the Amended Bylaws.[73] These included Paragon's purported failure to disclose its plans and proposals for OPT, information that could impede Paragon's nominees from obtaining a government security clearance, and Paragon's "substantial interest" in seeking control of the Board through a proxy contest.[74] The Board also stated that the Notice violated the Amended Bylaws because it contained "inaccurate" information.[75]

On September 12, Paragon amended its Schedule 13D filing and disclosed its intent to take control of OPT's Board.[76] The Schedule 13D also explained that if its nominees were elected, Paragon would take "immediate steps" to reduce expenses, "develop a measurable plan that will bring [OPT] to cash flow break even," and focus on potential industry growth.[77] The same day, Paragon submitted another

---

[72] *Id.* at 2.

[73] PX 36.

[74] *Id.* at '1350-53.

[75] *Id.*

[76] PX 39 at '4506-08.

[77] *Id.* at '4508.

14

letter to OPT supplementing the Notice and attempting to address certain issues raised in the First Deficiency Letter.[78]  Paragon's letter requested that OPT "promptly provide a complete list of any and all deficiencies claimed by [OPT] to exist in the Notice so that Paragon c[ould] take timely steps to address and, if needed, cure any issues."[79]

On September 14, OPT sent Paragon a letter detailing additional deficiencies (the "Second Deficiency Letter").[80]  OPT noted that there were still issues with the accuracy of the Notice and the September 12 supplement.[81]  With one day left before the nomination deadline, OPT said that its letter did "not contain a complete listing of all of the deficiencies."[82]  Paragon again supplemented the Notice on September 15.[83]

On October 12, OPT formally rejected the Notice.[84]

---

[78] *Id.* at '4501-05.

[79] *Id.* at '4504.

[80] PX 40.

[81] *Id.* at 2.

[82] *Id.* at 4.

[83] PX 41.

[84] PX 43.

## J.    This Litigation

Paragon commenced this action on October 10.[85]  Its complaint advanced two counts for breach of fiduciary duty.[86]  Count I concerns the Board's review and (then-presumed) rejection of the Notice.[87]  Count II pertains to the Board's rejection of the Exemption Request.[88]

Discovery commenced soon after the complaint was filed, and an expedited schedule was set.  On October 27, the defendants served interrogatory responses that detailed numerous purported deficiencies in the Notice.[89]  On October 31, Paragon responded to issues raised by the defendants by submitting another supplement to the Notice.[90]  The Board rejected this supplement as untimely and ineffective.[91]

On November 2—one day before the substantial completion deadline for document production—Paragon sought leave to amend its complaint and add claims related to the adoption of the Amended Bylaws.[92]  On November 9, I granted

---

[85] Dkt. 1.  This lawsuit followed a books and records action, in which Magistrate Molina granted Paragon's demand for certain materials.  PX 44; *Paragon Techs., Inc. v. Ocean Power Techs., Inc.*, C.A. No. 2023-0770-SEM (Del. Ch. Oct. 20, 2023) (TRANSCRIPT).

[86] Am. Compl. ¶¶ 131-67.

[87] *Id.* ¶¶ 134-36, 138.

[88] *Id.* ¶¶ 154-56.

[89] PX 45.

[90] PX 46.

[91] PX 49.

[92] Dkt. 47.

Paragon's motion for leave to amend with a "significant caveat": due to Paragon's delay and to prevent prejudice to the defendants given the highly-expedited schedule, the preliminary injunction hearing would only concern Paragon's original claims.[93]

On November 17, Paragon filed its motion for a preliminary injunction and opening brief in support.[94] Paragon asked that I enjoin the defendants from enforcing Section 1.10 of the Amended Bylaws and from taking actions that would prevent Paragon's nominees from standing for election at OPT's upcoming annual meeting. It also asked that I direct the defendants to grant the Exemption Request.[95] The defendants filed an answering brief on November 22, and Paragon's reply brief was filed on November 27.[96] Oral argument on the motion was held on November 28.[97] At that argument, the parties also addressed the defendants' motion for sanctions due to Gad's purported spoliation of text messages.[98]

---

[93] Dkt. 76.

[94] Dkt. 111.

[95] *Id.*

[96] Dkts. 125, 129.

[97] *See* Dkt. 128.

[98] Dkts. 127, 133, 135.

## II. LEGAL ANALYSIS

"The extraordinary remedy of a preliminary injunction 'is granted sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently.'"[99] To obtain preliminary injunctive relief, a plaintiff must demonstrate: "(1) a reasonable probability of ultimate success on the merits at trial; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable injury . . . ; and (3) that the balance of hardships weighs in the movant's favor."[100] Although there "is no fixed approach to how the court should weigh these elements relative to one another," the "failure to prove any of the three [] defeats the application."[101]

As Paragon acknowledges, a "higher mandatory injunction standard" applies here.[102] Paragon requests an order requiring the defendants to allow its nominees to stand for election and to grant its Exemption Request.[103] Paragon therefore must

[99] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

[100] *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007).

[101] *Jorgl v. AIM Immunotech Inc.*, 2022 WL 16543834, at *9 (Del. Ch. Oct. 28, 2022) (citing *Cantor Fitzgerald*, 724 A.2d at 579).

[102] Pl.'s Opening Br. in Supp. of Its Mot. for a Prelim. Inj. (Dkt. 111) ("Pl.'s Opening Br.") 21.

[103] [Proposed] Order Granting Pl.'s Mot. for a Prelim. Inj. (Dkt. 111); *see Union Pac. Corp. v. Santa Fe Pac. Corp.*, 1995 WL 54428, at *2 (Del. Ch. Jan. 30, 1995) (explaining that a preliminary injunction motion seeking an order directing the board to redeem a pill or grant an exemption involves mandatory relief); *Jorgl*, 2022 WL 16543834, at *9 ("[A]sking the

demonstrate its entitlement "as a matter of law to the relief [it] seeks based on undisputed facts."[104] That is, Paragon must "make a showing sufficient to support a grant of summary judgment."[105]

Paragon might have proven a reasonable probability of success on certain aspects of its claims. The Board adopted sprawling advance notice bylaws after Paragon's outreach, seemingly delayed and obfuscated in rejecting Paragon's notice, and then produced a laundry list of deficiencies. But Paragon opted to pursue mandatory injunctive relief on a preliminary record—one rife with factual disputes. Gad's apparent deletion of text messages makes matters worse. Mandatory relief is unavailable in these circumstances.

## A. The Nomination Notice Claim

Advance notice bylaws are "commonplace" and can serve important corporate purposes.[106] They "are designed and function to permit orderly meetings and

---

court to order the defendants to acknowledge his nominees as valid, permit his nominees to stand for election, and include his nominees on a universal proxy card . . . amounts to a request for mandatory injunctive relief.").

[104] *Jorgl*, 2022 WL 16543834, at *10; *see also BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 976-77 (Del. 2020).

[105] *Saba Cap.*, 224 A.3d at 977; *see also Sparton v. O'Neil*, 2018 WL 3025470, at *3 (Del. Ch. June 18, 2018) ("In order for a movant to be entitled to a mandatory injunction, the movant must show '(1) actual success on the merits; (2) irreparable harm; and (3) the harm resulting from failure to issue an injunction outweighs the harm befalling the opposing party if the injunction is issued.'" (quoting *ID Biomed. Corp. v. TM Techs., Inc.*, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995))).

[106] *Saba Cap.*, 224 A.3d at 980.

19

election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations."[107] They also serve "information-gathering and disclosure functions," "allowing boards of directors to knowledgably make recommendations about nominees and ensuring that stockholders cast well-informed votes."[108]

These goals must be carefully balanced against stockholders' "fundamental governance right" of voting for directors.[109] In weighing these interests, Delaware courts are often guided by the principle that "inequitable action does not become permissible simply because it is legally possible."[110]

My analysis of Paragon's claim takes two forms. I first consider whether Paragon has demonstrated that it complied with OPT's Amended Bylaws. I then consider whether the Board's rejection of the Notice was unreasonable under the enhanced scrutiny standard of review.[111]

---

[107] *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 239-40 (Del. Ch. 2007).

[108] *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *9, *18 (Del. Ch. Feb. 14, 2022).

[109] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).

[110] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971); *see also Sternlicht v. Hernandez*, 2023 WL 3991642, at *15 (Del. Ch. June 14, 2023) ("Cases challenging the application of an otherwise valid advance notice bylaw present a context-specific application of *Schnell*.") (citations omitted).

[111] *See Coster v. UIP Cos., Inc.*, 300 A.3d 656, 671-72 (Del. 2023).

### 1. Whether the Notice Complied with the Amended Bylaws

A corporation's bylaws are "interpreted using contractual principles."[112] The bylaw's terms are "given their commonly accepted meaning."[113] "[I]f the bylaw's language is unambiguous, the court need not interpret it or search for the parties' intent."[114] If an advance notice bylaw provision is "unclear" or ambiguous, "any doubt" is resolved "in favor of the stockholder's electoral rights."[115]

Paragon asserts that its Notice complied with the Amended Bylaws. The defendants disagree, arguing that the Notice suffered from numerous failings. For purposes of my analysis, I focus primarily on the issues identified in the First and Second Deficiency Letters rather than those raised for the first time in discovery.[116]

Some of the purported deficiencies are substantive; others are more trivial. I start with the former—specifically, whether Paragon disclosed its plans or proposals for OPT and related conflicts of interest as required by the Amended Bylaws. At a minimum, factual disputes exist concerning Paragon's compliance with these

---

[112] *Saba Cap.*, 224 A.3d at 980.

[113] *Hill Int'l, Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 38 (Del. 2015).

[114] *Id.*

[115] *Id.*

[116] Multiple alleged deficiencies were raised for the first time in the defendants' interrogatory responses. Given the timing, these issues seem more like litigation constructs than decisions underpinning the Board's rejection of the Notice. Perhaps a better developed record will show otherwise. For now, I consider the late-raised issues insofar as they provide context for matters mentioned in the First and Second Deficiency Letters.

21

provisions. Although other alleged deficiencies are less compelling (even meritless), I cannot find as a matter of law that the Notice satisfied the Amended Bylaws' requirements.

a.      Disclosure of Paragon's Plans or Proposals

Section 1.10(a)(3)(iv)(B) of the Amended Bylaws requires a nominating stockholder to disclose any "plans or proposals . . . that would be required to be disclosed by such stockholder . . . pursuant to Item 4 of Schedule 13D."[117]  In a letter to OPT stockholders filed with the SEC on July 7, 2023, Paragon declared that it had "a plan to fix OPT" and that it was "supremely confident [it] can execute that plan."[118]  Although Paragon attached this letter to its Notice, it did not describe any "plan."[119]  The Board cited this alleged omission as grounds for rejecting the Notice in the First Deficiency Letter.[120]

In responding to the First Deficiency Letter on September 12, Paragon told the Board that "[a]ll of Paragon's current plans and proposals for [OPT] and its business [we]re contained in the Notice, including without limitation in its letter to

---

[117] PX 10 at '0018.

[118] PX 18 at '2590; *see also* PX 23.

[119] *See* PX 33.

[120] PX 36 at 3-4.  Paragon asserts that this issue was "abandoned" in the Second Deficiency Letter.  Pl.'s Opening Br. 52.  But the Second Deficiency Letter stated that the Board "did not believe Paragon" addressed the concerns in the First Deficiency Letter and "refer[red] back" to the First Deficiency Letter.  PX 40 at 2.

22

shareholders, press releases, and Schedule 13Ds."[121]   At the same time, the September 12 letter attached a new Schedule 13D as a "supplement" to the Notice that explained Paragon's general intentions for OPT.[122]   Now, Paragon argues that any further plans for OPT were "vaguely formed thoughts for the future" and that it was not required to disclose anything more because Item 4 only concerns definite plans.[123]

I cannot, however, conclusively find that Paragon complied with Section 1.10(a)(3)(iv)(B).   Item 4 of Schedule 13D would require the disclosure of an extraordinary corporate transaction, a sale or transfer of a material amount of assets, a change to the board of directors or management, and similar types of transactions.[124]   Paragon's internal communications mention these sorts of plans, which were unmentioned in the Notice and Paragon's Schedule 13D filings.

---

[121] PX 39 at '4502.

[122] *Id.* at '4508 ("[I]f the Reporting Person's nominees are elected to the Company's board of directors, the Reporting Person intends to take immediate steps to: significantly reduce the expenses of the Company; develop a measurable plan that will bring the Company to cash flow break even; implement a disciplined and focused capital allocation strategy; and focus on the potential growth of the Company's intelligence data and leverage the possible market opportunities of Marine Advanced Robotics."); *see* Pl.'s Opening Br. 53.

[123] *See Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995) (explaining that Item 4 calls for disclosure of "certain enumerated types of plans or proposals"); 17 C.F.R. § 240.13d-101.

[124] *See* 17 C.F.R. § 240.13d-101.

For example, in a July 26 text message exchange between Jacobs and Weiser, Weiser described Gad's "approach" as a "risky" one to "shut [OPT] down" that Weiser was "not comfortable" with.[125] The next day, Weiser texted Gad saying: "you need a plan for the company – just cutting expenses and hoarding cash for Paragon to deploy won't work and will get us and OPT sued."[126] Weiser told Gad that he and Jacobs were "reconsider[ing]" their support if they "d[id]n't have a plan soon."[127] Gad then explained to Weiser that he saw "a path" for Paragon to "acquire the entire company stock for stock."[128] It would "essentially [be] OPT acquiring [Paragon]," but Paragon would "control the terms and get control of the company."[129] "One way or another," Gad said, it "has to be a win for Paragon."[130]

Paragon maintains that I should overlook these contemporaneous communications and conclude that no undisclosed plans existed by crediting the deposition testimony of Gad, Jacobs, and Weiser. Setting aside the difficulty in

---

[125] DX 23 at '2489.

[126] DX 24 at '2510

[127] *Id.* at '2511.

[128] *Id.* at '2496.

[129] *Id.*; *see also* DX 34 at '1402 (Tannor to Gad: "I would like to help you winning control of the board, and then depending on plans – going long."); DX 31 at '2285 (Gad to Tannor: "I believe we are aligned with the restructuring strategy."); DX 33 at '2397 (Gad telling Paragon's proxy solicitor that he had "identified potential acquisition candidates that deliver immediate revenues and profits to [OPT]").

[130] DX 24 at '2506.

doing so on a paper record, the three confusingly testified that—though Paragon's Schedule 13D disclosed a "plan to fix OPT"—they lacked any plan at all.[131] Further, Weiser testified that Gad "might propose" a stock for stock merger between OPT and Paragon if Gad were elected to the Board.[132]

Resolving whether Paragon is merely exploring loose goals for OPT or has definitive plans falling within Item 4 (and thus Section 1.10(a)(3)(iv)(B) of the Amended Bylaws) requires credibility determinations I cannot presently make.[133] Gad's deletion of evidence widens the gaps in the record.[134] Despite receiving a litigation hold reminder from counsel on October 13, Gad "clear[ed] out the text

---

[131] Gad Dep. 107 (testifying that he has ideas "based on what [he's] analyzed and seen from" OPT's public filings and that he wanted to learn information he is "unable to see as [a] nondirector[]" before "mak[ing] the appropriate business decision"); Weiser Dep. 93-95 (Q: "Can you please describe what the plan to fix OPT is that's referenced in the letter?" A: "We really don't have a plan."); DX 22 ("Jacobs Dep.") 164-67 (Q: "Colonel, based on what you just described, would you say that Paragon has no plan for OPT?" A: "Well in the way that you used the word 'plan,' we don't have a plan."). At times, the witnesses were instructed by counsel not to answer questions about undisclosed plans on business strategy immunity grounds. *See, e.g.*, Jacobs Dep. 97, 108.

[132] Weiser Dep. 215-16.

[133] Paragon insists that Gad only has "plans" in the colloquial sense. *See* Pl.'s Opening Br. 52-53; *see also Plan*, Merriam-Webster, www.merriam-webster.com/dictionary/plan (defining "plan" to include a "goal" or an "aim"). I cannot speculate about what was in Gad's mind.

[134] Paragon's failure to produce any Paragon board materials does not help. *See* Defs.' Answering Br. 30 n.104 (citing Weiser Dep. 89-90; Jacobs Dep. 156; Gad Dep. 15-16).

25

threads that appear lower down on [his] iPhone message list."[135]  Curiously, he did not "clear" messages with counsel.[136]

If Gad had a plan to pursue a transaction benefitting Paragon at OPT's expense, the Notice might violate other provisions of the Amended Bylaws.[137] Section 1.10(a)(3)(i)(I) of the Amended Bylaws requires a "description in reasonable detail of any business or personal interests that could place [a] [p]roposed [n]ominee

---

[135] Aff. of H. Gad in Opp'n to Defs.' Mot. for Sanctions (Dkt. 133) ("Gad Aff.") ¶ 12. According to the defendants, Jacobs also produced no texts, and Weiser produced screenshots with little metadata.  *See* Defs.' Answering Br. 30.  Gad's deletion of text messages was only revealed after, in ruling on a motion to compel, I ordered Paragon's counsel to provide the defendants' counsel with an explanation for the missing texts.  *See* Dkt. 109.  After learning that Gad deleted his texts, the defendants moved for sanctions. Defs.' Mot. for Sanctions (Dkt. 127).  On the current record, I cannot say with confidence whether Gad recklessly or intentionally spoliated evidence—a state of mind determination necessary for the adverse inference the defendants seek.  *See Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1192 (Del. Ch. 2009) ("[D]rawing an adverse inference is appropriate when an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction . . . .").  The request for dispositive sanctions is therefore denied, without prejudice to the defendants' ability to renew the motion later in this case. The motion for sanctions is granted insofar as Paragon must pay the reasonable fees and costs incurred by the defendants in filing the motion for sanctions.  *See Beard Rsch.*, 981 A.2d at 1194 ("To impose monetary sanctions, this Court need only find that a party had a duty to preserve evidence and breached that duty . . . .").

[136] Gad Aff. ¶ 12 (explaining that he did not "clear" messages with counsel at Thompson Hine because he and counsel "communicate on an ongoing basis" such that their text thread "appears at the top of [his] list of messages" that he generally does not "clear"); *see* DX 35 at 4 ("We inquired as to why Mr. Gad's iPhone did not contain OPT-related texts with anyone other than counsel at Thompson Hine.  Mr. Gad did not recall specifically why this would be the case but thought it might be because at some point he had cleared his phone of messages, as is his periodic practice.").

[137] *See* Weiser Dep. 37, 168-69 (testifying that OPT's value was and is greater than Paragon's value).

26

in a potential conflict of interest with [OPT] or any of its subsidiaries."[138] The Notice provided no responsive disclosure about whether the proposed nominees serving as directors of Paragon might have a conflict of interest in choosing between Paragon and OPT if they were elected to the Board.[139]

Section 1.10(a)(3)(i)(M) also mandates the disclosure of "all other information relating to such Proposed Nominee that would be required to be disclosed" in a contested meeting proxy statement "pursuant to Regulation 14A."[140] Regulation 14A would, among other things, require Paragon to disclose "any substantial interest, direct or indirect" that Paragon has in seeking control of the Board.[141] But the Notice stated: "None of Paragon, its controlling persons, or the

---

[138] PX 10 at '0016. The First Deficiency Letter cited the lack of disclosure about potential conflicts of interest as grounds for rejection. PX 36 at 4. Paragon responded on September 12: "Paragon does not believe there would be a conflict between the fiduciary duties owed by the Paragon directors to Paragon and the fiduciary duties owed to the Company if they are elected to the Company's board; therefore, no disclosure is required." PX 39 at '4503. The Second Deficiency Letter stated that the Board "continue[d] to believe" Paragon did not comply with the Amended Bylaws, "refer[red] back" to the First Deficiency Letter, and said that Paragon had not "adequately addressed" the issues raised in the First Deficiency Letter. PX 40 at 2.

[139] In its First Deficiency Letter, the Board asked for Paragon to provide OPT with a discussion of how the Paragon directors would reconcile any potential conflicts. PX 36 at 4. Paragon provided nothing in response.

[140] PX 10 at '0017.

[141] 17 C.F.R § 240.14a-101.

27

Nominees has any interest in the nomination of the Nominee at the Annual Meeting other than the protection and advancement of Paragon's investment in [OPT]."[142]

### b. Other Alleged Violations

The Board raised numerous other deficiencies in rejecting the Notice.[143] Several turn on disputed facts. Others are minor compared to those addressed above. And some appear meritless. Rather than sort through them all, I will focus on two of note.

One alleged deficiency concerns Section 1.10(a)(3)(i)(K) of the Amended Bylaws, which requires disclosure of all "events, occurrences, and/or circumstances involving or relating to the Proposed Nominee that could impact, impede, and/or delay" the candidate's ability to obtain a federal security clearance.[144] The defendants argue that Paragon flouted this bylaw by failing to disclose that Gad and his father are citizens of another country and hold foreign passports, and that Weiser is "financially overextended."[145] Their position is based on lengthy federal guidelines that are nowhere mentioned in the bylaw provision and on an expert

---

[142] PX 33 at '3249.

[143] *See* PX 36; PX 40.

[144] PX 10 at '0016.

[145] DX 36 ¶¶ 31-32; PX 46 at '2044-45.

opinion about the sort of matters that would affect the attainment of a security clearance.[146]

Paragon avers that this bylaw is ambiguous since stockholders are left to guess about the sorts of "events, occurrences, and/or circumstances" that "could impact" attaining a security clearance.[147]  I tend to agree.  It is unclear how a stockholder could predict if, for example, a nominee's credit card debt might impede this process.[148]  Even so, Gad—who is not a United States citizen—stated that there were "no facts that would prevent" him from obtaining a security clearance despite consulting with "legal counsel with extensive experience with U.S. government security clearances."[149]  On this record, I cannot say with any degree of certainty

---

[146] PX 45 at 13 (stating that the Notice violated "Section 1.10(a)(3)(i)(K) of the Amended Bylaws" because the  "Notice does not disclose in reasonable detail the events, occurrences, and/or circumstances involving or relating to the Purported Nominees that could impact, impede, and/or delay the Purported Nominees' ability to receive a security clearance from the United States Government that would allow them access to classified information" and citing 32 C.F.R. § 147); *see also* DX 36.

[147] Pl.'s Opening Br. 45.  Paragon also asserts that this issue was "abandoned" in the Second Deficiency Letter.  *Id.*; *see supra* note 120 (explaining that the Second Deficiency Letter incorporated the First Deficiency Letter).

[148] *See* DX 36 (opining that financial irresponsibility would impair or delay the ability to obtain a security clearance); *see also infra* note 174 (discussing the other information that the defendants believe would need to be disclosed in addressing this bylaw).  The Board members could not even agree on what one needed to disclose to satisfy the bylaw.  PX 58 ("Lorenz-Anderson Dep.") 128-30, 133, 143-44, 146; PX 55 ("Purcel Dep.") 88; Slaiby Dep. 98-106.

[149] PX 39 at '4503.  Gad did, however, answer "No" in response to a director questionnaire inquiry asking: "Are you a citizen of the United States of America?"  PX 33 at '3411-12.

whether Gad was confused about what the bylaw required or made no attempt to comply.[150]

The Board also rejected the Notice as "inaccurate" under Section 1.01(c)(1) of the Amended Bylaws.[151] The purported inaccuracies involve Paragon's statements that OPT's current Board members have "grossly neglected and violated their fiduciary obligation[s]," have engaged in "self-serving entrenchment actions," and are "unfit to serve OPT stockholders."[152] Whether true or not, these seem to be the sort of opinions often voiced in heated proxy contests—not statements of fact that could be called objectively wrong.[153]

---

[150] *See Openwave Sys.*, 924 A.2d at 240-41 (holding, after trial, that alleged confusion did not excuse a stockholder's failure to comply with an advance notice bylaw given the lack of evidence supporting this contention). As discussed below, the bylaw is suspicious. *See infra* notes 173-78 and accompanying text.

[151] PX 10 at '0022 ("If any information contained in a Stockholder Notice submitted pursuant to this Section 1.10 is determined to be inaccurate in any respect, such Stockholder Notice may be deemed not to have been provided in accordance with this Section 1.10."); *see* PX 36; PX 40; *see also* PX 45 at 9-10, 17.

[152] PX 45 at 9-10, 17; *see* PX 33 at '4194-97.

[153] *See Agar v. Judy*, 151 A.3d 456, 485-86 (Del. Ch. 2017) (concluding that allegations in a fight letter sent during a proxy contest that directors "loot[ed] the Company" were "personal opinion[s]" and not statements of fact); *see also Cummins v. Suntrust Cap. Mkts., Inc.*, 649 F. Supp. 2d 224, 256 (S.D.N.Y. 2009) (holding that a defendant's statement "accus[ing] the plaintiff of breaching his fiduciary duty . . . was plainly an opinion based on the disclosed factual circumstances . . . rather than an actionable assertion of a materially false fact"). Gad testified that he personally holds the beliefs expressed in the Notice. Gad Dep. 129-30. The Board cited the same allegations of mismanagement as violating Rule 14a-9. *See* PX 45 at 16-17. "Rule 14a-9 in no way prohibits the expression of an honest opinion" regarding the capabilities of incumbents. *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F. Supp. 951, 960 (S.D.N.Y. 1978), *rev'd on other grounds*, 584 F. 2d 1195 (2d Cir. 1978); *see also* Proxy Voting Advice, Exchange Act Release No. 34-95266,

30

Had Paragon not sought mandatory relief, I might have concluded that it was reasonably likely to prevail on some of these interpretative challenges.[154] I decline to complete that needless exercise. Given the higher standard that applies and my conclusion above regarding the plans and proposals disclosure provision (and potentially others), Paragon cannot prove as a matter of law that it complied with the Amended Bylaws. I go on to consider reasonableness of the Board's actions, which I turn to next.

2.    Whether the Rejection Can Withstand Enhanced Scrutiny

Paragon claims that the Board breached its fiduciary duties by impairing Paragon's right to freely vote for director candidates.[155] A "context-specific" form of the *Unocal* enhanced scrutiny standard guides my review of this claim.[156] The standard is "one of reasonableness" with the directors bearing the burden of proof.[157]

_____

at 51 (July 13, 2022) (available at www.sec.gov/files/rules/final/2022/34-95266.pdf) ("Rule 14a-9 liability does not extend to mere differences of opinion."). The SEC has not indicated to Paragon that it believes there has been a violation in Paragon's public filings. *See* PX 22; PX 48 at 12, 22.

[154] The above analysis is not exhaustive. Given the procedural posture of the motion and the exceedingly limited time to rule, I have not addressed every purported deficiency.

[155] *See Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *12 (Del. Ch. May 31, 2022), *aff'd*, 302 A.3d 387 (Del. 2023); *see also Sternlicht*, 2023 WL 3991642, at *14 (asking whether there is "some basis in equity to excuse strict compliance" with an advance notice bylaw).

[156] *Lee Enters.*, 2022 WL 453607, at *16; *see also Coster*, 300 A.3d at 671-72; *Pell v. Kill*, 135 A.3d 764, 787 (Del. Ch. 2016).

[157] *Coster*, 300 A.3d at 671-72 (citation omitted); *see also Mercier v. Inter-Tel. (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007).

31

The court first reviews "whether the board faced a threat 'to an important corporate interest or to the achievement of a significant corporate benefit.'"[158] "The threat must be real and not pretextual, and the board's motivations must be proper and not selfish or disloyal."[159] The court then assesses "whether the board's response to the threat was reasonable in relation to the threat posed and was not preclusive or coercive to the stockholder franchise."[160]

The Board contends that the rejection of the Notice "served valid corporate objectives of ensuring orderly director elections and accurate and complete disclosure by a nominating stockholder and its nominees."[161] Paragon insists that this is a pretense. In Paragon's view, the Board acted with the goal of entrenching itself and thwarting stockholders' voting rights.

The Amended Bylaws were approved after Paragon emerged as a significant stockholder and the potential for a proxy contest was known to the Board.[162] Yet

---

[158] *Coster*, 300 A.3d at 672; *see also Lee Enters.*, 2022 WL 453607, at *15-16 (explaining that the defendants must "identify the proper corporate objectives served by their actions" and "justify their actions as reasonable in relation to those objectives" (citation omitted)).

[159] *Coster*, 300 A.3d at 672.

[160] *Id.* at 672-73.

[161] Defs.' Answering Br. 48.

[162] *See* PX 70 at No. 24; PX 71 (Stratmann emailing Cryan on April 14 that Gad "posted a letter demanding a board seat"). Paragon believes that the Amended Bylaws were not adopted on a clear day. *See* Pl.'s Opening Br. 25-27. Although Paragon has pleaded a claim challenging the adoption of the bylaws, it is not before me on the present motion. *See* Order Granting with Modifications Pl.'s Mot. for Leave to File Am. and Suppl. Compl. (Dkt. 76) ("To address prejudice to the defendants . . . the preliminary injunction hearing

the defendants presented some evidence that the Board decided to amend OPT's bylaws to align with the universal proxy rules recently adopted by the SEC.[163] In addition to incorporating provisions related to the universal proxy rules, the bylaws were amended to include additional disclosure requirements.[164] Several of the Amended Bylaws enforced by the Board are consistent with these purposes.

Rejecting a nomination notice for failing to disclose plans or proposals falling within Item 4 promotes the disclosure function of advance notice bylaws.[165] If Paragon sought to undertake a stock for stock transaction with OPT, the Delaware General Corporation Law might not require stockholder approval.[166] "The prospect

---

set for November 28 will only concern the plaintiff's original claims (Counts I and II).”). I consider the Board's adoption of the Amended Bylaws to the extent it is relevant to my assessment of the Board's response to Paragon's Notice.

[163] *See* Cryan Dep. 23 ("I reached out to Mr. Gottfried . . . because I wanted to consider engaging him to do a review and potential update of the bylaws . . . At no time during that conversation did I mention Paragon or the conversation that had taken place between Mr. Gad and Dr. Stratmann."); *id.* at 29-30; Stratmann Dep. 123 (Q: "And I think you said these bylaws really were unconnected to my client [Paragon] coming forward and sending you a letter, right? A: "Correct." Q: "And unconnected to the phone call you had with my client?" A: "That's correct. Yes."); DX 14.

[164] Paragon asks me to reject the Board members' testimony and find that the Board amended the bylaws with the goal of impairing its ability to run a proxy contest. To do so would require me to make credibility assessments, which I am not equipped in this procedural posture. For now, there is a genuine factual dispute about whether the Board perceived Paragon as a threat at the time that it approved the Amended Bylaws.

[165] Bylaws § 1.10(a)(3)(iv)(B); *see Lee Enters.*, 2022 WL 453607, at *18.

[166] *See Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *20 (Del. Ch. Oct. 13, 2021) (describing a bylaw requiring the disclosure of a past acquisition proposal as essential since any future acquisition could be approved unilaterally by the board).

33

that a nominee may seek to facilitate an insider transaction is the type of potential conflict that stockholders are entitled to know about when voting for directors" in a contested election.[167] The Board's enforcement of provisions requiring the disclosure of potential conflicts and "substantial interests" pursuant to Regulation 14D is also related to this end.[168]

I could stop there, but fear that I would leave the reader with an impression that nothing appears amiss. The preliminary record prompts me to look skeptically at the Board's response to the Notice. The goalposts were never fixed. Paragon submitted its Notice with three weeks left in the nomination window, which would give it time to cure any deficiencies. In response, though, the Board chastised Paragon for "inexplicably rush[ing]."[169] The Board continuously declined to provide a complete list of deficiencies when it rejected the Notice—nearly five weeks after

---

[167] *Id.* at *17; *see id.* at *20.

[168] Bylaws § 1.10(a)(3)(i)(I), (M); *see also van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) ("[S]tockholders are 'entitled to know that certain of their fiduciaries ha[ve] a self-interest that [is] arguably in conflict with their own.'") (citation omitted).

[169] PX 34.

receiving it.[170] A litany of new deficiencies were then identified in the defendants' written discovery responses.[171]

The defendants argue that their delay was the result of Paragon submitting a confusing Notice that attached hundreds of pages of documents without cross-referencing the relevant Amended Bylaw provisions. Maybe so. Or perhaps the Board was sifting through the Notice to dig up deficiencies. Some of the shortcomings identified by the Board are nitpicky.[172] Others are suspect.

---

[170] *See* PX 36 (First Deficiency Letter; "OPT notes that this letter does not contain a complete listing of all the deficiencies in the Purported Nomination Notice."); PX 39 (Paragon asking OPT on September 12 to inform it of any deficiencies so it could "cure" them); PX 40 (Second Deficiency Letter; "OPT notes that this letter, together with our September 8 letter, does not contain a complete listing of all the deficiencies in, and our concerns with respect to, the Purported Nomination Notice.").

[171] PX 45.

[172] For example, the Board said that the Notice was deficient because Paragon filed a July 7 stockholder letter under the cover of Schedule 13D rather than as proxy soliciting materials, in purported violation of Rule 14a-12 and Section 1.10(c)(8) of the Amended Bylaws. *See* PX 36 at 2-3. The SEC did not share the defendants' view. PX 22; PX 48 at No. 5. As another example, the defendants cited the failure to disclose that Gad and Harpen served on a Las Vegas condominium board together as a deficiency "call[ing] into question" Harpen's independence of Gad. PX 45 at 18. The defendants also highlighted Jacobs' failure to disclose two prior lawsuits from 2005 and 2009 as violating Section 1.10(a)(3)(i)(F), which requires a "description in reasonable detail of any and all litigation" relating to prior board service. *See* PX 46 (disclosing litigation on October 31, 2023). *Cf. CytoDyn*, 2021 WL 4775140, at *19 (confirming that the board acted appropriately where it rejected a notice for failure to disclose "vitally important information" and explaining that "the Board was not nitpicking when it flagged the omission as material and ultimately disqualifying").

The security clearance bylaw stands out.[173] I could see utility in a bylaw requiring a nominee to disclose known barriers to obtaining a security clearance if the Board needed to oversee matters involving classified information. The Board required much more and rejected the Notice because Paragon could not divine whether its candidates had personal issues that might touch on federal guidelines unreferenced in the bylaw.[174] None of the country's three largest defense contractors have a bylaw resembling that of OPT.[175] And none of the current Board members have a security clearance; only Stratmann (as CEO) is working to obtain one.[176] In fact, OPT has no contracts at this time that would require a security clearance.[177] Given this context, I must wonder about the Board's intentions in adopting and enforcing this bylaw. The Board apparently considered that Paragon's nominees

---

[173] Bylaws § 1.10(a)(3)(i)(K).

[174] The defendants say that the Notice violated Section 1.10(a)(3)(i)(K) of the Amended Bylaws because it did not disclose information that might affect the candidates' ability to receive a security clearance from the federal government pursuant to 32 C.F.R. § 147.4. PX 45 at 13-14. But the Part 147 guidelines contain multiple subsections that involve everything from "foreign influence" to "sexual behavior" and "alcohol consumption." 32 C.F.R. § 147(c)(2), (4), (7).

[175] Lockheed Martin and RTX (Raytheon) have no security clearance provision in their bylaws. PXs 64-65. Boeing has a provision that requires disclosure "of any instance in which such nominee was denied (and not subsequently granted) or has applied for and not been granted, a security clearance." PX 66 at 8.

[176] *See* Hewlett Dep. 51-56; Lorenz-Anderson Dep. 99; Slaiby Dep. 82.

[177] *See* Hewlett Dep. 51; Lorenz-Anderson Dep. 102. Again, there is nothing in the record to the contrary.

might have difficulty obtaining a security clearance before it approved the Amended Bylaws.[178]

Additionally, a bylaw mandating the accuracy of a nomination notice bears a facial link to the goals of maintaining orderly elections and ensuring appropriate disclosure. But Section 1.10(c)(1), which allows the Board to reject an "inaccurate" notice, was adopted after the directors discussed that Paragon's May 18 letter contained "incorrect" statements that were "critical" of OPT.[179] The Board cited this bylaw in finding the Notice noncompliant because it deemed Paragon's criticisms of the OPT's directors and management to be inaccurate. If a board could call a nomination notice deficient simply because it disagreed with opinions voiced by the nominating stockholder, rejection would be a foregone conclusion.[180] Irrespective of any good intentions in ensuring that notices are accurate, the Board's dismissal of the Notice based on Paragon's opinion statements appears preclusive in effect.

_____

[178] Hewlett Dep. 130 (Q: "It was discussed at the June 5, 2023 board meeting that these individuals may have difficulty obtaining a security clearance, correct?" A: "To the best of my recall."); *see also* PX 9 at 3 (June 5 minutes: "The Board moved on to a discussion on the appropriate profile of Board candidates . . . and the need for security clearances at the Board and senior management levels."); *id.* at 2 ("Mr. Gottfried presented the Board with the publicly available background with respect to Paragon, and its key personnel . . . and its history as an activist shareholder with other companies.").

[179] PX 9 at '2941.

[180] *Cf. Agar*, 151 A.3d at 485 (noting that a stockholder reading a fight letter sent during a proxy contest would anticipate exaggerated characterizations of the incumbent directors and would not reasonably conceive of allegedly false statements as being "anything other than an expression of [the stockholder's] opinion").

37

\*        \*        \*

Paragon is (perhaps rightly) frustrated by aspects of the Board's denial of the Notice. Rather than focus on disqualifying matters, the Board slowly rolled out ever-growing lists of deficiencies with varying degrees of significance. Nevertheless, equity does not compel me to grant the motion. Paragon has not asked for a prohibitive injunction, such as one preventing the annual meeting from going forward until a trial could occur. It asks me to force the Board to accept its nomination and include its director candidates on OPT's universal proxy card.

On this preliminary record—and particularly given Gad's curious deletion of texts—it would be irresponsible to hold that the Board breached its fiduciary duties in rejecting the Notice.[181] Factual disputes abound. Critically, there are indications that Gad had undisclosed plans for OPT's business, leaving me unable to conclude that Paragon fully complied with the Amended Bylaws.[182] If Paragon were hiding

---

[181] *See C&J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1053-54 (Del. 2014) ("Mandatory injunctions should only issue with the confidence of findings made after a trial or on undisputed facts."); *Richard Paul, Inc. v. Union Improvement Co.*, 86 A.2d 744, 748 (Del. Ch. 1952) ("Relief by mandatory injunction should only be awarded in a clear case, free from doubt, and when necessary to prevent irreparable harm.").

[182] *See Jorgl*, 2022 WL 16543834, at \*17 (denying a motion for a mandatory preliminary injunction where the plaintiff purportedly concealed "information [that] would have been necessary for stockholders to make an informed choice").

such crucial information, the Board's decision to reject the Notice would be reasonable.[183] Whether this was pretextual will be resolved after trial.

## B. The Exemption Request Claim

An "NOL poison pill's principal intent . . . is to prevent the inadvertent forfeiture of potentially valuable assets, not to protect against hostile takeover attempts."[184] "Notwithstanding its primary purpose, an NOL poison pill must also be analyzed under *Unocal* because of its effect and its direct implications for hostile takeovers."[185] Accordingly, I first consider whether the Board had "reasonable grounds for concluding that a threat to the corporate enterprise existed."[186] I then assess whether the Board's "response was reasonable in relation to the threat identified."[187]

### 1. Whether the Board Reasonably Identified a Threat

To determine if the Board identified a legitimate threat, the court undertakes "a process-based review."[188] In doing so, the court considers whether the Board

---

[183] *See CytoDyn*, 2021 WL 4775140, at \*21 (explaining that the board's rejection of the notice was appropriate where it "legitimately suspected" that undisclosed motivations were behind a nomination and evidence discovered in litigation corroborated those suspicions).

[184] *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 599 (Del. 2010) ("*Selectica II*").

[185] *Id.*

[186] *Id.*

[187] *Id.* at 601 (citation omitted).

[188] *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 92 (Del. Ch. Feb. 15, 2011).

engaged in a "good faith and reasonable investigation."[189]  "Proof of a good faith and reasonable investigation is 'materially enhanced . . . by the approval of a board comprised of a majority of outside independent directors.'"[190]  Independent board approval, "coupled with the advice rendered by [outside advisors] and legal counsel, constitute[s] a *prima facie* showing of [a] good faith and reasonable investigation."[191]

Paragon does not assert that preserving the value of OPT's NOLs is an illegitimate corporate objective.[192]  It argues that this purpose is pretextual, with the only "threat" being to the Board's incumbency.[193]  Some facts support Paragon's position.  For example, the Board appears to have developed a heightened concern with protecting its NOLs after the April 14 call between Gad and Stratmann.[194]  This

---

[189] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985).

[190] *Airgas*, 16 A.3d at 92 (quoting *Unocal*, 493 A.2d at 955); *see also Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062, at *12 (Del. Ch. Feb. 26, 2010) ("*Selectica I*"), *aff'd*, 5 A.3d 586 (Del. 2010).

[191] *Polk v. Good*, 507 A.2d 531, 537 (Del. 1986) (citing *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del. 1986)); *see also Selectica I*, 2010 WL 703062, at *12.

[192] *See Selectica I*, 2010 WL 703062, at *15 (confirming that "the protection of company NOLs may be an appropriate corporate policy meriting a defensive response when threatened").

[193] Pl.'s Reply Br. in Supp. of its Mot. for a Prelim. Inj. (Dkt. 129) ("Pl.'s Reply Br.") 31.

[194] PX 70 at No. 29; PX 71.

is bolstered by the subsequent adoption of the Section 382 Plan as part of "Project Echo" along with the Amended Bylaws.[195]

There is, however, evidence that the Board undertook a good faith and reasonable investigation. The Section 382 Plan was adopted after the Board received a report from OPT's Chief Financial Officer that reflected an outside accounting firm's analysis. This report stated that OPT's NOLs were of substantial value and worth preserving.[196] When evaluating the Exemption Request, the Board held two meetings where it received a presentation from EisnerAmper and guidance from counsel.[197] The record also indicates the Board believed that the NOLs have "significant" value exceeding OPT's market capitalization,[198] that OPT sees a path

---

[195] *See* PX 6; PX 12.

[196] DX 9; PX 14 at '4704-05; DX 10; *see also* DX 11; DX 12. Paragon argues that the Board acted unreasonably because it "failed to obtain any analysis of the net present value of its NOLs." Pl.'s Reply Br. 32. As the court explained in *Selectica I*, however, the board was not required to conduct "formal analysis of when the Company could reasonably expect to receive tax savings from the use of its NOLs, as well as the amount of tax savings it could reasonably expect to obtain." 2010 WL 703062, at *16. It was enough that the Board had "ample reason" to conclude that "the NOLs were an asset worth protecting and [] that their preservation was an important corporate asset." *Id.*

[197] PX 38 at '5199-200; PX 67 at '5209-14; *see Williams Cos. S'holder Litig.*, 2021 WL 754593, at *29 (Del. Ch. Feb. 26, 2021) (concluding that a board, comprised of "nearly all independent, outside directors," which considered rights plan at two meetings and were advised by legal and financial advisors, conducted a good-faith, reasonable investigation).

[198] Cryan Dep. 13; *see also id.* at 48-49, 70.

to profitability within two years, and that OPT expects to use its NOLs to offset taxable income.[199]

Paragon asserts that its Exemption Request did not pose a threat to OPT's NOLs because even if it acquired 19.9% of OPT's stock, "there would still be a significant buffer before the 50% threshold was reached."[200] The Board has, however, presented evidence that granting the Exemption Request would pose a risk to OPT's ability to utilize the NOLs. According to Cryan, Paragon increasing its ownership to 19.9% "would place some significant limitations on the amount of stock [OPT] could issue to raise capital . . . without triggering the change-of-control limitation on the NOLs."[201] EisnerAmper advised that an investment of 19.9% "would effectively cut the buffer in half" and take three years for the effect to drop off.[202]

### 2. Whether the Board Acted Reasonably in Relation to the Threat

The second part of a *Unocal* review considers the proportionality of the board's response to a threat.[203] The court must consider whether the Board's actions

---

[199] *See* DX 47; Cryan Dep. 48.

[200] Pl.'s Opening Br. 59.

[201] Cryan Dep. 315; *see also* Purcel Dep. 108-09, 201-02.

[202] DX 48 at '4671.

[203] *See, e.g.*, *Williams*, 2021 WL 754593, at *35; *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995).

were "draconian, by being either preclusive or coercive," and fall "within a range of reasonable responses."[204] "*Unocal* and its progeny require that the defensive response employed be a proportionate response, not the most narrowly or precisely tailored one."[205]

Paragon asserts that "[i]f the Exemption Request is not granted," it "will be deprived of the opportunity to purchase additional shares that it can vote at the Annual Meeting."[206] But that is not the standard. Rather, "[f]or a measure to be preclusive, it must render a successful proxy contest realistically unattainable given the specific factual context."[207] I have no reason to believe that Paragon (had it submitted a compliant Notice) would have been prevented from "marshal[ing] enough shareholder votes to win a proxy contest."[208]

In addition, the threat posed by Paragon's acquisition of OPT shares is "qualitatively different from the normal corporate control dispute that leads to the adoption of a shareholder rights plan."[209] It would be reasonable for the Board to

---

[204] *Unitrin*, 651 A.2d at 1367; *see also id.* at 1388 (recognizing the "need of the board of directors for latitude in discharging its fiduciary duties to the corporation and its shareholders when defending against perceived threats").

[205] *Selectica I*, 2010 WL 703062, at *24.

[206] Pl.'s Opening Br. 60.

[207] *Selectica II*, 5 A.3d at 603.

[208] *Id.* By comparison, the incumbent Board members own less than 0.7% of OPT's stock—less than a fifth of that held by Paragon. PX 18 at '2588; DX 49.

[209] *See Selectica I*, 2010 WL 703062, at *24.

conclude, in reliance on advice from tax and legal advisors, that granting the Exemption Request could threaten OPT's ability to raise capital (even in the absence of NOL limitations).

On these facts, mandatory relief ordering the Board to grant the Exemption Request would be inequitable. The Board was not required to gamble with its most valuable corporate asset to satisfy Paragon. The motivations driving the Board to reject the Exemption Request will be properly measured with the benefit of a trial.

## III. CONCLUSION

Paragon has not succeeded on the merits of its claims. Therefore, I need not consider whether it has demonstrated irreparable harm or if the balance of hardships tips in its favor. Paragon's motion for a preliminary injunction is denied.